so United States versus Ross, Yokeley versus Pfeiffer, Vargas versus Perez have all been, are all submitted on the briefs. With that we have our first argument case, Mantachian, am I pronouncing that name correctly counsel? Your Honor, it's Mantachian. Mantachian versus Garland and counsel when you are ready. Thank you, Your Honor. Good morning, may it please the court. My name is Catalina Gracia and I represent the petitioner Karen Mantachian. At this time I'd like to reserve two minutes of my time for rebuttal. The petitioner's claim gives rise to several issues. I'll start first with whether the BIA properly found that the petitioner had abandoned his asylum application. Pursuant to 8 CFR, an applicant who leaves the United States without first obtaining advanced parole is presumed to have abandoned his or her asylum application. Since the regulation indicates a presumption, it's fair to argue that the petitioner has the right to overcome that plain language of the regulation should be looked to first. Here, the plain language clearly invites a rebuttal. If legislators intended otherwise, a word not inviting rebuttal such as deemed would have been used in lieu of the word presumed. So counsel, let's let's say we agree with you that language that has a presumption in it necessarily implies that it is rebuttable unless it says it's that the BIA erred in finding that the presumption wasn't rebutted here. Well, your honor, so the BIA relies heavily on subsection B of 1208.8, arguing that because there's an exception to subsection B and there's not an exception to subsection A, that it should be found that there is no opportunity for a rebuttal. But I again go to the plain language of the statute. Counsel, I think that was the IJ's position. The BIA took the position that the applicant has not provided sufficient explanations to overcome the presumption of abandonment. So it seems to me that the BIA adopted the theory of the reading of the statute that you have urged on us, but said that he had not overcome the presumption. And that's a finding that we can only reverse if the record, as Judge Bennett points out, if the record compels a contrary conclusion. So what compels a contrary conclusion? So part of the issue that the BIA cited was a credibility issue. The respondent did provide, or the petitioner did provide an explanation as to why. Well, he did. He provided an explanation that I agree is arguably plausible, but isn't our standard that the agency is not required to accept even a plausible explanation? That is the standard. However, that's not what the BIA cites. They cite that there was an issue with his credibility. And in this case, if you look to the record and you look to the I-213 that was submitted by DHS, the language of the I-213 says that he was a returning asylee without proper authorization. But counsel, when you look at the facts here, and you're looking at what overcoming abandonment means, I mean, this was, I mean, maybe in some circumstances, a two day trip to Canada would be enough. But here, he went to Spain, he sold his belongings, which would indicate no intent to return. He said he was running away from his life and his problems. He didn't contact the Customs Agency. And only, I think, after his mother, but I might have that wrong, came and tried to convince him that he come back. He was looking for personal refuge. Why isn't, why aren't those facts, facts that support that he did abandon and would be contrary to any evidence that he would abandon? So why aren't those facts enough here? I mean, those are pretty stark as to somebody who is just leaving the country. Well, he did come back prior to his individual hearing. So he showed up for that hearing. And he showed up in, in time to pursue that hearing. And he did sell his belongings. But that's understandable, given that he was going through a divorce and separating from his wife and moving from the home. He didn't go. That's one, that's one reason. But it's also consistent with I'm leaving America. I'm not coming, I'm not coming back. And he did come back. But is it your view that as a matter of law, simply coming back is enough to overcome the presumption? Well, it's the coming back coupled with the fact that he indicated to the DA, to the officer when upon his seeking to move forward with his asylum application. And there's also no indication that he left the country to return to Denmark to where he was claiming asylum from he he went to Spain, and then he returned to the United States to pursue the application. And I'm a little I'm a little confused on that point. Maybe you can help me because my recollection is that he said that maybe I have this wrong that during this period, he was a resident of both Spain and Denmark. Am I misremembering the facts? Your Honor, to my knowledge, he was not a resident of Spain. He was a citizen of Denmark only the family just spent significant time vacationing in Spain, but there's no indication they Oh, no, I'm sorry. I thought that he was saying that during his time in Spain, he was also still a resident of Denmark, but maybe I have that fact wrong. Right. And in Spain, he made no, there's no evidence in the record that he purchased a home there that he intended to stay there, especially given that this is a tight family unit, and his entire family was in the United States, his mom, his sister, everyone was here. So that supports a contention that he was returning to the United States. And his explanation for leaving may not be the most legally sound reason, but it is an explanation. And his actions followed upon the that may represent a change in position. And I'm not sure that the agency is responsible for accepting it. Because the testimony is that his parents went to Spain to talk him into coming back to the United States. Fortunately, they got there in time so that he got that he got back to the United States before his hearing. But that they may represent a complete change in his in his attitude and what he intended to do. Where's the error in what the BIA found what the IJ found with respect to this? Well, the BIA, the IJ didn't want to give him the opportunity to even rebut the presumption but didn't include language saying that even if there was a presumption, and even if he did rebut that presumption, he wasn't credible. So the IJ didn't give him an opportunity to fully explain his position. And that was because of the credibility issue. Are there more facts that you didn't get into the record that you would have liked to have gotten into the record? Simply that his state of mind at the time was one of a very confused and traumatized individual. And yes, there were more facts that we wanted to get in the record to support this position. And that was part of the motion to reopen that the medical the evaluation, the psychological evaluation that was not available prior because he was he was in custody, that medical evaluation, lens of lot sheds a lot of light on his mental state and what he was going through when when he left to Spain and, you know, mental health component of his claim. And so those facts weren't previously available. And, and that's part of the that was part of the issue. Had he been given the opportunity to present the medical evaluation on the motion to reopen, it would have shed light on the failed to show that the evidence or substantially similar evidence was not reasonably available at the hearing. How did the BIA abuse its discretion in making that determination? Well, well, discretion because the medical documents that he provided with the motion to reopen or not available. He was in custody upon return from Spain, he was taken into DHS custody, he was in custody until his individual hearing. And while in DHS custody, there, there are health medical professionals, but there's no mental health professionals to provide a report, or then to come testify at a hearing in immigration court. So when he was released from custody, he underwent the medical evaluation, and the report then became available. It didn't exist at the time of his individual hearing. And the other component of that was his sister's asylum claim, the grant did not exist prior to the motion to reopen. Well, maybe the documents didn't, but I'm not sure about, about the facts. But on that issue, also, in order to show that you can win a motion to have to show prima facie eligibility for the relief sought, and my recollection is you didn't address that in your opening brief, why isn't that waived? Your Honor, as far as the his eligibility, it was outlined in the details of the of the application and the details of the of his position. But that's, that's, that's not my question. My question is, in order for it not to be waived, don't you have to specifically put it in your opening brief that this issue of prima facie eligible for the relief sought and if that's in your brief, you can point it out to me when when you're on your rebuttal case if you want. Thank you, Your Honor. So that wasn't cited in our brief, because the brief was focused on the on the motion to reopen and the facts that were contained in the supplemental documents, including the medical report and the sister's asylum grant. So we relied on those documents in lieu of counsel. The fact that his sister has been granted asylum, I think is a very, very powerful fact. Because we're going to I naturally I'm sort of assuming that as part of a close knit family that they're that they're, they've suffered some similar experiences in Denmark. But there's no underlying facts. We have no way of comparing these two things. We have no way of knowing all we've got in the in the in the in the record is the judge's a great deal, and doesn't shed any new doesn't shed anything on on on what her claim was. But if we go to the beginning of this, this claim, Your Honor, the mother filed an asylum application for her son. And then the son, the petitioner in this case application was joined with his sister. So at one point, their application was essentially the same, it was the same set of testimony by the mother and by the petitioner. So those are those facts clear in the record of this case? Yes, they are clear that what happened to the sister and what happened to the petitioner are very clear. The sister was harassed, she was called derogatory name, she was physically assaulted, similar to the petitioner. And that is in the record. So while we don't have the the transcript of what happened at her asylum hearing, we do have the facts that were presented during the petitioner's asylum hearing. And they are similar to what occurred in her case, I'm sure she claimed the same thing in her asylum application, and she supplied the same country conditions because they resided in Denmark at the same time. And that was enough for an immigration judge to find that she was persecuted and that she was eligible for the relief sought. So two judges found contradictory conclusions on the same exact country conditions. Well, we don't know whether there was any finding of non credibility on part of on the part of the sister. And when there was here, right, that's just not in the record, right? You're correct, Your Honor, but there's no issue as to country conditions and the persecution that she suffered there. So there's no issue as to credibility on those country conditions report, Your Honor, going back to the question regarding the sister's asylum claim, and whether the judge there had relied on a finding based on the country conditions in Denmark, that was the case, it's heavily referenced, the country conditions in Denmark are heavily referenced throughout the petitioner's brief. And they're also referenced in regards to the sister's claim and the fact that her claim rested on those exact same country conditions. I don't have the I can't cite the actual decision from the IJ on the sister's claim. But based on the information provided in the petitioner's brief, I would say that there was a basis for her asylum claim on what she endured in Denmark. Judge Judge Bennett, can you hear me? Yes. Okay. I've just disappeared off of my off of my screen. So I don't know whether anybody else can still see me. But I can't see me. But anyway, let me let me go on with my question. Counsel, if you had if you had an IJ, if you had an IJ in the sister's case, who had found one thing with respect to country conditions in Denmark, and an IJ in your case, finding different things with respect to the country conditions in Denmark, it seems to me you would have had a very powerful case for urging the BIA to reopen at least one of those cases, most likely your client's cases, because it would have been a conflict between IJs that the BIA would be responsible for reconciling. How do we reconcile that when we don't have any of this evidence in the record? What your honor, it can be reconciled by remanding this to the immigration judge to evaluate the petitioner's claim and possibly the sister's claim. But certainly there's enough here to reopen the case just on the on the new evidence and the new documentation that was provided by the petitioner relating to his mental health and his and the report that was provided that was not available and could not have been made available prior to the motion to reopen. So there's enough there to get us to the immigration judge. And certainly the country conditions need to be evaluated at that point. And the claim of the sister of the petitioner's claim needs to be evaluated as well. Do you want to reserve your time, counsel? Yes, your honor. All right. So, counsel for the Attorney General, whenever you're ready. And you're muted. Sorry about that. That's okay. Judge, Judge Bybee, you are able to hear us all? Yeah, I'm back on video. Okay, great. Okay, thank you. Okay, counsel. Thank you. Good morning, your honors. May it please the court. My name is Julie Iverson. I represent the United States Attorney General. Mr. Muntachian has not shown that the record compels the conclusion that he sufficiently overcame any presumption that he abandoned his applications for relief and protection by departing the United States without obtaining advanced parole, or that his claims were credible. Either these determinations was dispositive of his relief applications, and his claim that he was not engaged by the agency is compelled is fatal to his first petition for review. With respect to the abandonment issue, as Judge Bennett noted, petitioner left the United States, he sold his belongings, he wanted to run away. Counsel, before before you get into the facts on the abandonment, what is the Attorney General's position on 1208.8a? Is a petitioner able to rebut the presumption of abandonment? Or is the Attorney General's position that this is somehow an irrebuttable presumption? The immigration judge in this case, found that there was no ability to rebut the presumption. However, as Judge Bybee noted, the board did not rely on that aspect, and appeared to assume that there was a presumption, or that he could overcome the presumption. There's a dearth of case law on this. Okay, well, I understand that. But I'm asking for the Attorney General's position. You're here representing the Attorney General, this is obviously at issue in this case, is the Attorney General's position that this is a presumption that can be rebutted? And if the Attorney General's position is that it can't be, why? Why would that be? I only, Your Honor, I only have the, that the board assumed without reaching that it was a rebuttable presumption. I don't have the, I don't have the position. I just have that they assumed that it was, the board assumed it was. So they assumed without reaching that it was rebuttable. I don't have, I don't have a concrete position on it. And there's not a lot of case law on the, on this particular regulation. Okay, why don't you go ahead with your argument. Okay, thank you, Your Honor. As I mentioned, Mr. Montachian had left the United States to run away from his problems, sold his possessions, did not get advanced parole prior to departing, did not tell his family, and it seems that he only returned because his family tracked him down and encouraged him to do so. The agency found that he had not rebutted any presumption that he intended to abandon his applications, and the record does not compel a contrary conclusion. So counsel, assuming that the presumption is rebuttable, what point in time do you look at? If someone leaves the country, and at that, you look at the moment they leave the country as to whether by the leaving they intended to abandon it, and there's nothing that can happen afterward that can show that they didn't. What point in time do you, do you evaluate in determining whether there is abandonment? Because even if you could find that when he left, he intended to abandon, can you resurrect the intent to reassert by coming back and saying, I want to press my asylum claim when, when, when should we evaluate it? I think, I don't know, the agency did not seem to have to address that particular question of at what, at what point the intent is formed, and whether the I know and I'm asking you to address it, what, what point should, should we look at? That the, Your Honor, the agency did not address that question. But if, if the court feels that that question should be addressed, then the board should have the opportunity to address it in the first instance. However, there's also the adverse credibility determination, which is dispositive. So it might not be necessary for the board to, to address that. I would, I would just be speculating at what point it would be because the board did not reach that or did not specifically address that at what point in time the intent is formed and whether it could be changed or not. It strikes me that broadly reading what the BIA said, they had to have been looking at all of the all of the evidence because they didn't specify. I think, I think that's a, I think it could be considered almost like a totality looking at everything. They did not specifically address that, but it appears from what, what the board said, or what the agency said that they were looking at everything, all of the, all of the factors. Counsel, I'll tell you, I'll tell you what, I'll tell you what I'm most concerned with. I think the most disturbing fact in this record is the fact that his sister was granted asylum after a hearing before an IJ. Now that's, that is utterly independent of the questions of adverse credibility, whether he may have augmented some of the story someplace or added to certain stories that made him not credible. It has the feel that the core of the story must be true because a sibling got the same, got, got, received asylum from a different IJ. What, what do we do with that fact here? Well, first there were, with respect to the motion to reopen, there were two independently dispositive bases that the board relied on to deny the motion to reopen. As noted, the, the failure to establish prima facie eligibility was one independently dispositive bases the board relied on. So even with the, the evidence that Mr. Matachian submitted with the motion, the board found that he had not demonstrated that he would be eligible for relief. And as noted, Mr. Matachian did not sufficiently challenge that in his opening brief on the second petition. And also, even if it's found that he did sort of raise a challenge to it, he does not tether that challenge to the applicable abuse of discretion standard of review. So he's not shown that the board's determination that he had not shown prima facie eligibility. Counsel, I think these are all, I think you're probably technically correct on all of these arguments, but they do feel pretty technical. So I'm, I'm, I'm taking a little bit, a little, I'm up the ladder of abstraction just a little bit. It's just disturbing to me that two IJs looking at what I'm assuming, because we don't have any evidence in the record, must be similar treatment. These, these siblings were not separated. One of them was not in college and one someplace else. One didn't go with, if the mom and dad had divorced, one didn't go with the mom and one go with the dad. They might have very, very different claims. There's nothing to suggest that. The mother filed the claim on behalf of both kids together, and I assume that her evidence was, was admitted in both, in both proceedings. And I have to assume, although I wish I had the evidence in the record, that the IJ in the sister's case had to make some kind of determination about the state of affairs in Denmark. And it's therefore disturbing to me to have such disparate results come about from that. Again, this is independent of the question as to whether Mr. Mantaccian got in and embellished his, his story before the IJ. As Your Honor noted, we just don't know. We, the board said that she could have submitted a statement or she could have testified on his behalf. So we don't know the, what her exact claim was. I know that in the record, in the motion to rejoin the, the, the two cases, the sister, the sister's case and Mr. Mantaccian's case, counsel for Mr. Mantaccian noted that the claims were similar except to the degree of persecution. So we just don't know. There appears to be other things that happened to the sister that may not have happened to the brother, but we just don't know because of Mr. Mantaccian's failure to call her as a witness or provide a statement from her in his proceedings. So it was proper for the board to rely on, the board properly said or found that, that like evidence regarding her claim could have been submitted previously but was not. And just because one sibling gets granted asylum does not entitle the other sibling to an automatic grant of asylum. No, but if the, if, if the IJ in the sister's case said, I have examined carefully the claims regarding the arson at the home and I find that, that they have, that the petitioner has satisfied her burden of proof. It is evident that skinheads made threats against her brother both before and after this incident. And that is the most likely explanation for how the home was burned. If we, if they, if we had, if they had submitted evidence that showed that that's what that immigration judge said, then that would, then the board could have considered that. But they, they did, they submitted a one-page order that did not indicate what the basis of her asylum, her receiving asylum was. And then it... Is the government concerned about the possible disjunct here? I mean, this just, this just feels like the government doing two different things with respect to the same, to the same family. That it feels like, that intuitively ought to be treated the same. I think given the absence of evidence of what her actual claim was, there's some, there's other components that Mr. Montachian testified to regarding his sister that were not present in his claim. But we just don't know. The board did not have, did not know what the parameters of her claim, what the specific parameters of her claim were. But she could have, that is something that could have been answered had she testified or provided a statement during Mr. Montachian's underlying proceedings. But the bottom line is that nobody at DHS or at DOJ has likely put these two records sort of side-by-side and tried to reconcile them and say, ah, here's the difference. Here's what requires a different, a difference in treatment. Oh, I think, I think that had Mr. Montachian put those, those records side-by-side, then the board would have had that opportunity. But Mr. Montachian deprived the, the board of that opportunity, or the IJ of that opportunity. But far as you know, nobody at DHS or DOJ has ever put those two things side-by-side and said, here's how we reconcile the disjunct between the way that we treated Mr. Montachian and the way we treated his sister. As far as I know, no. And there's case law cited in, in the government's brief that talks about different family members where, where one gets a grant of asylum and one does not get a grant of asylum. And sometimes there's just some differences in those claims that, that results in a different outcome. And so I just don't remember. Is there anything in the record from Petitioner as to any impossibility or difficulty in obtaining this information about the sister's asylum claim? I, I don't recall anything in the record about why. No, there's nothing that I recall in the record about why it would have been difficult for him to obtain his sister's asylum claim information regarding that. He seems to, he seemed to focus more on the difficulties of getting the mental health evaluation because he was in detention. Which I would like to note that he was not in detention from, from 2014 when he first applied for asylum independent of his mother until December 2016. So the detention argument does not hold water in that case because he was not in detention the whole time. Are there any questions that, that the court would like me to address? Any additional questions? Okay. Your honors. I don't see any. Okay. Mr. McDowell, I'd like to note that the standard of review is a substantial evidence standard and it's extremely deferential. And even if the court as, as a fact, if the court were a fact finder, it would find one way. It doesn't mean that it was, it doesn't mean that another fact finder could not have found a different way. And only what, only if a, a different conclusion is compelled, can Mr. Montachian prevail on his claims with respect to his applications for asylum and withholding a cap. He's failed, he's failed to show that. Counsel, would the government have any interest in seeing this go to mediation so that, so that the records could be looked at? Um, I, I, I think that the only record before the court now is the record in Mr. Montachian's case. I understand what's before us. I'm asking a very different question. Would the government have any interest in sorting this, in sorting this out perhaps through mediation? So we can figure out whether there really is a problem here or whether there isn't a problem. Since nobody's ever looked at this. If, uh, if Mr. Montachian had some sort of additional evidence that had bearing on his claim, then perhaps, uh, then perhaps sometimes we go to mediation to talk about the petitioner filing a motion to reopen or something like that. Um, I had raised the possibility of mediation, uh, in August to opposing counsel about another issue, just kind of to see if they had any sort of alternate relief possibilities given his United States citizen family and LPR family. But I never heard back. So, so, so counsel, why don't you do this? Why don't you in the next couple of days, uh, try to make a determination with, uh, opposing counsel, uh, as to, uh, whether you think, whether you'd like the court, cause we're going to submit this case when we're done with argument as to whether you'd like us to vacate submission and refer this case to mediation. Uh, and, uh, we will assume if we don't hear anything in the next few days that there isn't an agreement to do that. Um, but, uh, will you take the lead and seeing if the parties wish to do that, uh, jointly? Uh, yes, your honor. I'll, um, I'll consult the agent that my client agency and, and see what they, um, and I'll circle around with petitioner circle back to petitioner. All right. Thank you. Uh, you have, uh, you have some time left. Thank you, your honor. I'm going back to the sister's asylum case and the grant in that case. Petitioner is not arguing that he should automatically be granted asylum because the sister was granted asylum. We're just simply asking the court to take a look at his case again through the lens of the IJ that granted the sister's claim. Again, not arguing that he's an automatic grant for asylum, but simply that this case does warrant a second look. It warrants a second, uh, review given that. Counsel, you, you, you're going to have a very limited amount of, of time in the next week or so to, uh, work with government counsel as to whether there are grounds for mediation. It, it, it might, it might be, it might be very forward thinking on your part to scramble and see if you can get those records as fast as possible. And take a look at them and, and then make some, and then make your pitch to the government as to, as to why an injustice has been done. Perhaps it will show that no injustice has been done here. Yes, your honor. Was there anything that prevented your client from making the argument that his case should be treated the same as his sister's case? Well, your honor, the, simply that while they did experience a lot of the same harm, there was differences in what each of them suffered. And originally the cases would have been treated, uh, or would have been heard jointly, but, but for the fact that my client was in custody and was on a detained docket and his sister was on a non-detained docket. So, so yes, the position of the petitioner initially was that both cases should be heard together and should be treated similarly. Unfortunately, that's not the way it played out because he left the country and then was on a, on a detained docket. And so unfortunately that didn't work out, but that was the position of the petitioner, that the cases should be heard together. All right. I think we have, uh, your, uh, your arguments. The case just argued will, will be submitted, uh, and we'll move to the next case.
judges: Linn, BYBEE, BENNETT